Connolly, Thomas E., J.
The plaintiff, the Commonwealth of Massachusetts Department of Correction (DOC), filed this action pursuant to G.L.c. 150C, §11, requesting this Court vacate an arbitration award reversing the termination of Paul Brouillette (Brouill-ette). The defendants, the Massachusetts Correction Officers Federated Union (the Union) and Brouillette, filed a Motion for Judgment on the Pleadings and a Motion to Confirm the Arbitration Award pursuant to G.L.c. 150, §13.[1] The DOC cross moved for judgment on the pleadings.
BACKGROUND
The DOC and the Union are parties to a collective bargaining agreement (CBA), pursuant to which the parties have agreed to a grievance and arbitration process to resolve disputes pertaining to the CBA. Article 23 of the CBA provides that no employee shall be discharged without just cause.
The DOC has a zero-tolerance policy for domestic violence both within and outside the workplace. See 103 DOC 238.01. The DOC defines domestic violence as “a form of abuse among family or household members . . . Abuse is defined as ‘the occurrence of one of more of the following acts between family or household members’:
a. Attempting to cause or causing physical harm;
b. Placing another in fear of imminent serious physical harm;
c. Causing another to engage involuntarily in sexual relations by force, threat or duress."
103 DOC 238.03. Further, 103 DOC 238.07(4) states that ”[a]cts of . . . domestic violence, regardless of where they occur, shall not be tolerated and may result in discipline, including” termination.
On April 25, 2009, the DOC terminated Brouillette because
On or about April 6,2008, you engaged in a physical altercation with your wife and following the physical altercation, you threatened her. As a result of this conduct, you were arrested and charged with Assault And Battery And Intimidation Of A Witness. *578 The charges were ultimately dismissed, because your wife invoked her marital privilege not to testify. You did not properly report the dismissal of the above-mentioned charges. Additionally, you were less than truthful when interviewed by a Departmental Investigator regarding this matter.
The DOC found that Brouillette had violated 103 DOC 238[2] and the Rules and Regulations Governing All Employees of the Massachusetts Department of Corrections (“Blue Book”).[3] The Union filed a grievance on Brouillette’s behalf, alleging that the DOC terminated him without just cause in violation of Article 23 of the CBA. On June 15, 2010, an evidentiary hearing was held and the parties argued the matter before Arbitrator Lawrence E. Katz.[4]
On September 28, 2010, the Arbitrator found that the discharge of Brouillette was not for just cause. The Arbitrator reversed the discharge, imposed a three-day suspension, and granted Brouillette his lost wages and benefits. The Arbitrator indicated that the DOC was required to prove its charges by clear and convincing evidence because a person’s job could be terminated. The Arbitrator’s conclusion was based on the following factual findings.
After attending a birthday party on April 6, 2008 at which Brouillette consumed “a fair amount of alcohol,” Brouillette and his wife “engaged in one or two separate verbal altercations . . . The point of disagreement in this proceeding is whether the altercations became physical, and, if so, what occurred.” Brouillette testified at the hearing before the Arbitrator that there had been some mutual pushing and shoving and Brouill-ette decided to leave the house. Brouillette returned shortly before midnight and the “verbal altercation continued.” Brouillette’s wife called 911 and reported that Brouillette had hit her. Brouillette left the house before the police arrived and started to drive away.
Dartmouth Police Officer Michael Gill was dispatched to the Brouillette house to respond to a complaint of domestic violence. When he was en route, he received a second call from the dispatcher, reporting that Mrs. Brouillette had called again to report that Brouillette had called her and told her he was coming back to the house and he was going to kill her. While approaching the house, Officer Gill came upon Brouillette’s car. Officer Gill noticed a blood spot on Brouillette’s head. Brouillette said that his wife had hit him with a notebook. Officer Gill also noticed a hand-set from a cordless telephone on the front seat of the car.
Officer Gill proceeded to the Brouillette home where Mrs. Brouillette advised him of the following: Brouill-ette threw a notebook at her which left a mark under her left eye; Brouillette punched her in the left breast; Brouillette took the downstairs cordless phone and when she went to use the upstairs phone to call the police, he followed her and ripped the telephone out of the wall, threw her on the bed, and pinched her left breast. Mrs. Brouillette also told Officer Gill that after Brouillette had left the house, he called her and told her he was coming back and threatened to kill her. Mrs. Brouillette declined to apply for a restraining order against Brouillette.
Officer Gill asked Mrs. Brouillette for permission to take photographs of her injuries. The following photographs were taken and entered into evidence at the hearing: a photograph of the bruise under Mrs. Brouillette’s left eye “as well as some type of bruise or reddening on the upper portion of her left breast"; the upstairs telephone which had been removed from the wall; and the cordless handset from the downstairs telephone which was found on the seat of Brouillette’s car.
Brouillette was arrested and charged with domestic assault and battery and intimidating a witness, a felony. Brouillette was arraigned on April 7, 2008 and telephoned his supervisor to advise him of the arrest and charges. On April 8, 2008, Brouillette submitted the following written report:
On April 6, 2008 while at home my wife and I got into an argument after coming home from a 50th birthday party. Both of us were drinking all night and the argument got to the point where she pushed me and I pushed her back ... I then left the house and was pulled over in front of my house and arrested. I do not remember that much about the night due to having too much to drink . . .
At a court hearing on June 18, 2008, Mrs. Brouill-ette invoked her marital privilege and refused to testify against her husband, although she did not recant her prior reports of the incident. The DA dismissed the charges against Brouillette. Mrs. Brouillette did not tell her husband that she had invoked the marital privilege; instead, she told him that she had told the ADA that her original version of events was not true. Brouillette informed his supervisor that the charges had been dismissed and was advised that he did not need to file a written report.
On September 12, 2008, the DOC interviewed Brouillette in connection with its investigation. Brouillette denied that he had hit, pinched, or punched his wife or that he had caused any injuries. He did acknowledge that he and his' wife had an argument and that there had been some mutual shoving. The DOC investigator questioned the credibility of Brouillette’s claim in his written report that his recollection was diminished due to alcohol consumption.
On December 12, 2008, the DOC informed Brouill-ette that a hearing would take place on January 5, 2009. The letter indicated that the investigation revealed that on April 6, 2008, Brouillette had a physical altercation with his wife and had threatened her, that Brouillette did not properly report the dismissal of the criminal charges to the DOC, and that Brouillette was “less than truthful” when interviewed by the DOC’s investigator. The letter also stated that Brouillette *579 might be subject to discipline up to and including termination.
Mrs. Brouillette did not attend the hearing, but prepared a statement (but not an affidavit as erroneously referred to numerous times in the Arbitrator’s report), in which she recanted the statements she made in her 911 call[5] and to Officer Gill. She stated that she fabricated the assault and the threat to get back at Brouillette. Mrs. Brouillette had new explanations for her injuries. She stated that she threw a spiral notebook at Brouillette and in the process, the protruding wire from the spiral notebook accidentally caught the corner of her eye and that the bruise on her upper left breast came from her granddaughter the night before. With respect to the telephones, she stated that she severed the upstairs phone from the wall prior to the party while she was vacuuming, and that Brouillette did not take the downstairs cordless phone from the house deliberately; rather, it had been inadvertently mixed in a pile of clothes he had brought out to the car.[6]
The DOC Hearing Officer did not find Mrs. Brouillette’s recantation credible and sustained the charges. The DOC terminated Brouillette on April 29, 2009. The Arbitrator noted that although not mentioned in the termination letter, Brouillette had a prior domestic incident on record — a 30-day suspension, imposed on April 25, 2005, based on misconduct which occurred in 2004.[7]
On September 28, 2010, the Arbitrator issued his decision finding that the lack of a written report was “at worst, a technical violation of Rule 2(b), which would not justify anything more than an oral warning.” With regard to the domestic violence charge, the Arbitrator stated:
I am not unsympathetic to the difficulties which DOC faced in attempting to prove the grievant’s alleged misconduct without the cooperation of the alleged victim. I share DOC’s views as to the likely motivation behind Mrs. Brouillette’s reversal. I share DOC’s views as to her lack of credibility.
As a result, if I had to guess, I would be inclined to believe that Mrs. Brouillette’s initial reports of the incident were accurate; that her subsequent recantation was not truthful; and that the grievant’s denial of the incident was not credible or truthful. Based upon this analysis, one might think that the DOC would prevail. . .
In the present case, however, other than the griev-ant (and his wife), there were no third parties who witnessed the alleged altercation. As a result, there is no first-hand evidence to the more incriminating version of events . . .
If I had to guess, my guess would be that the grievant did strike his wife in some matter. He might also have threatened her. However, notwithstanding the possible logic of this guesswork, it is not sufficient in my view, to establish, clearly and convincingly, that the grievant assaulted or threatened his wife (as those offenses are described in 103 DOC 238.03, l.a and b . . .). Discharge cases may not stand on suspicions, surmise or guesswork.
In sum, while the overall evidence engenders strong suspicions that the grievant may have engaged in assaultive and threatening behavior which would have constituted domestic violence as defined in the DOC policy, it fell short of proving, clearly and convincingly, that such misconduct occurred.
The evidence only established that the grievant engaged in a verbal altercation with his wife and that he pushed his wife on the evening in question.
Finally, the Arbitrator found that Brouillette’s September 2008 interview statements had been untruthful “in one relatively minor way — his explanation of his removal of the cordless telephone from the house.”
The Arbitrator concluded:
[T]he major charge against the grievant — domestic violence — was not proved. While that form of misconduct, if proved, would have been likely to provide just cause for discharge (particularly in view of the prior offense on the grievant’s record), that severe penalty may not be justified on the basis of the far less serious misconduct which has been proved . . .
I found that the grievant had a verbal altercation with his wife and pushed her (albeit without proof that he injured her or threatened her, which would have constituted domestic violence) . . .
On an overall basis, the proven misconduct, in view of the grievant’s prior disciplinary record, provided just cause for a disciplinary suspension of no more than three days’ duration. Although the more severe form of domestic disturbance was not proved (domestic violence),[8] it was proved that there was a domestic disturbance with some pushing, and which became a matter of public knowledge when the police were called and arrested him . . .
The Arbitrator reversed the discharge, reinstated Brouillette, imposed a three-day suspension, and granted Brouillette his lost wages and benefits.
DISCUSSION
The Court has held a hearing and has closely reviewed the pending motions, their supporting and opposition memoranda, and the entire Court file, including the 27-page Arbitration Decision.
The Court’s review of an Arbitrator’s findings and legal conclusions is veiy limited. A Court is “strictly bound by an arbitrator’s findings and legal conclusions, even if they appear erroneous, inconsistent or even unsupported by the record at the arbitration hearing.” Lynn v. Thompson, 435 Mass. 54, 61 (2001). “A matter submitted to arbitration is subject to a very narrow scope of review. Absent fraud, errors of law or *580 fact are not sufficient grounds to set aside an award.” Plymouth-Carver Regional School District v. J. Farmer & Co., 407 Mass. 1006, 1007 (1990; see also Boston v. Boston Police Patrolman’s Assn., 443 Mass. 813, 818 (2005) (stating that there is a strong policy favoring arbitration); Lynn, 435 Mass. at 62 (reviewing Court is “not free” to ignore arbitrator’s conclusions merely because they appear unsound); Trustees of the Boston & ME Corp. v. Massachusetts Bay Transp. Authority, 363 Mass. 386, 390 (1973) (“Even a grossly erroneous decision is binding in the absence of fraud”); Sheriff of Suffolk County v. AFSCME Council 93, Local 419, 67 Mass.App.Ct. 702, 705-06 (2006), quoting from School Comm. of Pittsfield v. United Educators of Pittsfield, 438 Mass. 753, 758 (2003) (“ The courts are not authorized to reconsider the merits of an award even though’ it is wrong on the facts and the law, no matter if it is a wise or foolish decision”). “Our deference to the parties’ choice of arbitration to resolve their disputes is especially pronounced where that choice forms part of a collective bargaining agreement.” Boston, 443 Mass. at 818.
As an initial matter, the Court finds that the Arbitrator’s Decision is unfair because the Arbitrator was clearly partisan toward Brouillette and the Union. The Arbitrator’s partisanship can been seen in his reliance on the later conjured up fabrications of Mr. and Mrs. Brouillette, the refusal of the Arbitrator to admit Officer Gill’s testimony concerning Mrs. Brouillette’s 911 emergency call to the Dartmouth Police Department to report that Brouillette had hit her, the Arbitrator’s admission and consideration of a later signed statement by Mrs. Brouillette,[9] and a refusal to acknowledge Mrs. Brouillette’s injuries even though she told Officer Gill about them, showed them to the police, and allowed the police to photograph them.[10]
The advantages of arbitration are well known. It allows for the speedy, efficient, uncomplicated resolution of disputes with reasonable costs. When the parties agree on an arbitrator, the parties receive “what they agreed to take, the honest judgment of the arbitrator as to a matter referred to him.” Jordan Marsh Co. v. Beth Israel Hospital Assn., 331 Mass. 177, 186 (1954). However, problems arise when an arbitrator is not honest, but a partisan for one side. Here, as discussed above, the Court finds that the Arbitrator was a partisan throughout the arbitration proceeding and in his Decision. One simple reading of the Decision shows the Arbitrator’s blatant partisanship.
The procedure for the discharge of an offending employee at the DOC or any other state department or agency must be done carefully, deliberately, and fairly. It is extremely important to afford the employee and the employer with fairness, due process, and careful compliance with the law, regulations, and policies. Fairness to both of the concerned parties, at a minimum, requires the appointment of an Arbitrator who is fair and impartial in all proceedings and in writing and issuing his Decision. If the Union and the DOC have agreed to go to binding arbitration in their CBA the least that the parties should expect and deserve is a fair and impartial arbitrator. That, they did not receive in the arbitration proceedings and Decision here.
However, this Court does not see, on the record presented, evidence that the award was procured by “corruption, fraud or other undue means,” as those terms are used in ch. 150C, §11 and the cases thereunder. It sees partialiiy to the Union and Brouillette and unfairness to the DOC. However, that finding is not sufficient to vacate the Arbitrator’s award. The arbitration was provided for in the CBA between the Union and the DOC, and all parties agreed to the appointment of Mr. Katz. Stated quite simply, the Court does not have the authority to vacate the arbitration decision and award on the basis of Mr. Katz’s partial decision.
A. Public Policy Exception
The DOC argues that the arbitration award should be set aside on the ground that the Arbitrator’s order to the DOC to reinstate Brouillette offends strong public policy. See Boston, 443 Mass. at 818 (court will not permit an arbitrator to order party to engage in action that offends strong public policy); see also G.L.c. 150C, §11(a)(3) (“[T]he Superior Court ‘shall’ vacate an [arbitration] award if . . . the arbitrators exceeded their powers or rendered an award requiring a person to commit an act or engage in conduct prohibited by state or federal law”); Massachusetts Highway Dep't v. American Federation of State, County, and Municipal Employees, Council 93, 420 Mass. 13, 16 (1995) (noting that award that requires party to engage in action that offends strong public policy is beyond the arbitrator’s powers). The question of public policy is one of the court and not an arbitrator. Boston, 443 Mass. at 818.
The court applies a “stringent, three-part analysis to establish whether the narrow public policy exception requires [the court] to vacate the arbitrator’s decision.” Id. *581 Lynn, 435 Mass. at 62-63 (citations and internal quotations omitted) (emphasis in original). See also Boston, 443 Mass. at 814 (vacating arbitration award reinstating police officer because officer’s “continued employment as a police officer would frustrate strong public policy against the kind of egregious dishonesty and abuse of official position in which he was proved to have engaged”). However, “(i]f an award is permissible, even if not optimal for the furtherance of public policy goals, it must be upheld.” Massachusetts Highway Dep’t, 420 Mass. at 19.
*580 To meet the criteria for application of the public policy exception, the public policy in question must be well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests . . . The public policy exception does not address disfavored conduct in the abstract but [only] disfavored conduct which is integral to the performance of employment duties . . . Finally, we require a showing that the arbitrator’s award reinstating the employee violates public policy to such an extent that the employee’s conduct would have required dismissal.
*581 As discussed above, the Arbitrator found that the evidence established that Mr. Brouillette “engaged in a verbal altercation with his wife and that he pushed his wife on the evening in question.” The Arbitrator found that Mrs. Brouillette was not injured in any way, notwithstanding the police photos of her injuries, and revoked his termination. This Court, finds that the Arbitrator’s order to the DOC to reinstate Brouillette is inconsistent with public policy.
The DOC has a strong policy prohibiting domestic violence by, among others, its correctional officers either within or outside the workplace. See 103 DOC 238. The Policy for the Prohibition of Sexual Assault, Domestic Violence and Harassment provides, in pertinent part: “Acts of sexual assault, domestic violence or harassment, regardless of where they occur, shall not be tolerated and may result in discipline, including, but not limited to: . . . suspension, demotion or termination.” 103 DOC 238.07(4). Further, G.L.c. 125, §9 provides that “no person who has been convicted of a felony or who has been convicted of a misdemeanor and has been confined in any jail or house of correction for said conviction, shall be appointed to any position in the department of correction ...” Even though Brouillette was not convicted of assault or battery or intimidating a witness, “(t]he fact that the charge did not result in a conviction does not alter the equation. It is the felonious misconduct not a conviction of it that is determinative.” Boston, 443 Mass. at 820; see also City of Boston v. Boston Police Patrolman’s Association, 74 Mass.App.Ct. 379, 382 (2009) (“[T]he critical factor is that the conduct was felonious — not the degree or nature of the felony”).
In addition, the conduct which Brouillette engaged in is “integral to the performance” of his employment duties even though Brouillette was not working when the incident occurred. Correction officers, just as police officers, take an oath of office. See Ch. 125, §10. In Boston, 443 Mass. at 823, the Supreme Judicial Court held “people will not trust the police . . . unless they are confident that police officers are genuine in their determination to uphold the law” and that police legitimacy would be undermined by the public’s knowledge that a police officer who violated the law was reinstated. The same is true for correction officers. The misconduct by Brouillette “undermines the public’s faith in the integrity of our correction facilities in the Commonwealth” and undermines the ability of those employed in such institutions to rehabilitate inmates. See Massachusetts Department of Corrections v. Massachusetts Corr. Officers Federated Union, 23 Mass L. Rptr. 160, 162 (Mass.Super. 2007) (Cratsley, J.), 2007 WL 2937578. “One of the most important police functions is to create and maintain a feeling of security in communities. To that end, it is extremely important for the police to gain and preserve the public trust, maintain public confidence in the integrity of police officers, and avoid an abuse of power by law enforcement officials.” Boston, 443 Mass. at 819, quoting Clancy v. McCabe, 441 Mass. 311, 328 (2004) (Ireland, J. dissenting). This is equally applicable to correction officers. The image presented by corrections personnel to the general public and to the inmates of our prisons permeates other aspects of the criminal justice system and impacts its overall success.
Finally, the DOC has demonstrated that the Arbitrator’s award reinstating Brouillette violates public policy to such an extent that his conduct requires dismissal. Cf. Boston, 443 Mass. at 820-21 (“The Legislature has forbidden persons found to have engaged in such [felonious] conduct from becoming police officers and, by implication, from remaining police officers”). As stated above, there is no question in the Court’s mind that Brouillette should never be a correction officer for the DOC again. When the Court takes into consideration (1) his two violations of the DOC’s zero-tolerance domestic violence policy, one involving his former girlfriend and the other involving his wife; and (2) the place (prison) where he wishes to return to work, this Court believes that strong public policy and common sense dictates that he not be allowed to return to the DOC. To allow Brouillette to return to the Massachusetts DOC as a correctional officer would simply not be safe for the prisoners, his co-employee guards, and the DOC. A correctional officer deals with prisoners, some of whom are dangerous, mentally disturbed, violent and just plain hostile and angry to everyone there, including correction officers. It makes absolutely no sense for the DOC to be required to put Brouillette back in a correctional institution as a guard with his record of abusing others. He had his punishment for the first offense ameliorated, and he deserves no more amelioration. Public policy requires that he not be allowed once again to return to a Massachusetts prison as a correctional officer.
ORDER
After hearing and review of all submissions, the Court ORDERS that:
1. The Petition of the Commonwealth of Massachusetts, Department of Correction to Vacate the Arbitrator’s Award pursuant to ch. 150C, §11 is ALLOWED and the Decision and Order of the Department of Correction of April 25, 2009 by Commissioner Harold W. Clarke is REINSTATED and AFFIRMED.
*582 2. The Plaintiffs Cross Motion for Judgment on the Pleadings is ALLOWED.
3. The Defendants’, Massachusetts Correctional Officers Federated Union and Paul Brouillette, Motion for Judgment on the Pleadings is DENIED.
4. The Defendants’ Motion to Confirm the Arbitration Award pursuant to eh. 150C, §13 is DENIED.
ATTACHMENT
AMERICAN ARBITRATION ASSOCIATION ARBITRATION DECISION Re Termination of Paul Broullette
AGREED ISSUE
Whether the grievant was terminated without just cause?
If so, what shall be the remedy?
CONTRACTUAL & REGULATORY PROVISIONS
A. Collective Bargaining Agreement
ARTICLE 23 — Arbitration of Disciplinary Action Section 1.
No employee . . . shall be discharged without just cause. . .
Any discipline imposed shall be consistent with Departmental policy.
B. Rules/ Regulations 1. DOC “Blue Book” (Rules and Regulations) GENERAL POLICY
I. * * * Nothing in any part of these rules and regulations shall be construed to relieve an employee . . . from his/her constant obligation to render good judgment [and] full and prompt obedience to all provisions of law. Improper conduct affecting or reflecting upon any correctional institution or the Department of Correction in any way will not be exculpated whether or not it is specifically mentioned and described in these rules and regulations . . .
1. STANDARDS OF CORRECTIONAL SERVICE
You must remember that you are employed in a disciplined service which requires an oath of office. Each employee contributes to the success of the policies and procedures established for the administration of the Department of Correction and each respective institution. Employees should give dignity to their position and be circumspect in personal relationships regarding the company they keep and places they frequent.
*583 2. GENERAL REQUIREMENTS; . . . TERMINATION
(b) Report promptly in writing to your Superintendent, DOC Department Head, or their designee, any change of events regarding . . . any involvement with law enforcement officials pertaining to any investigation, arrest or court appearance.
19. ADMINISTRATIVE PROCEDURES
(c) Since the sphere of activity within an institution or the Department of Correction may on occasion encompass incidents that require thorough investigation and inquiry, you must respond fully and promptly to any questions or interrogatories relative to the conduct of an inmate, a visitor, another employee or yourself. Pending investigation into the circumstances and your possible involvement therein, you may be detached from active duly forthwith, however, without prejudice and without loss of pay.
2. Policy for the Prohibition of Domestic Violence
(103 DOC 238)
238.01 POLICY
The Commonwealth has a zero-tolerance policy for domestic violence occurring within or outside the workplace.
238.03 DEFINITION OF DOMESTIC VIOLENCE
1. * * * Abuse is defined as “the occurrence of one or more of the following acts ...”
a. Attempting to cause or causing physical harm; or
b. Placing another in fear of imminent serious physical harm; or
c. Causing another to engage involuntarily in sexual relations
238.07 PROCEDURES FOR INVESTIGATING AND DISCIPLINING ABUSERS
4. Acts of domestic violence, regardless of where they occur, shall not be tolerated and may result in discipline, including, but not limited to:
a. An oral warning or reprimand;
b. A written warning or reprimand . . .;
c. Required completion of a certified batterer intervention program;
d. Suspension, demotion, or termination; or
e. Any combination of the above
BACKGROUND
Paul Brouillette, the grievant, was employed as a Corrections Officer for 11 years. By letter dated April 25, 2009, Commissioner Harold W. Clarke advised the grievant that his employment was being terminated based upon an incident of alleged domestic violence which had occurred on April 6, 2008, as well as perceived inaccuracies or incompleteness in his reporting of the incident and/or subsequent court proceedings arising therefrom.
The termination letter indicated, in pertinent part, that the grievant “engaged in a physical altercation with [his] wife and following the physical alteration, [he] threatened her.” This inculpatory version of events was based upon contemporaneous reports of the incident made by the grievant’s wife to the Dartmouth Police Department, which appeared to indicate that she had been assaulted and threatened — allegations which the grievant had denied from the outset. Nevertheless, the Police saw fit to arrest him and to charge him with domestic violence and witness intimidation. However, when the matter proceeded to court, the grievant’s wife declined to testify against him (citing the marital privilege). As a result, the criminal charges were dropped.
Notwithstanding the dismissal of the criminal charges, DOC proceeded with its investigation. In the end, it concluded that the more exculpatory version of events being put forward by Mrs. Brouillette (as well as the grievant) was not credible; that the more incriminating version initially reported was accurate. As a result, DOC found that the grievant was guilty of domestic violence and it made the above-noted decision to proceed with the termination.
The parties disagree as to whether the evidence presented was sufficient to establish the more incriminating version of events upon which DOC acted. They also disagree as to whether any lesser misconduct which may have been proved was sufficient to justify the extreme penalty of discharge. In order to evaluate the parties’ divergent views of the matter, we will review the evidence as to the reportage of the incident, as well as certain other evidence generated during the investigation. We will also consider the grievant’s alleged inaccuracies or incompleteness in his reporting of the incident and/or the resulting court proceedings.
A. The Incident of April 6-7, 2008
The grievant and his wife attended her brother-in-law’s 50th birthday party at a Moose Lodge in New Bedford on Sunday evening, April 6, 2008. During the course of the evening, it appears that the grievant consumed a fair amount of alcohol. Although his wife had done some drinking as well, she drove home. During the drive, the grievant commented about the behavior of one particular young woman, indicating that she had been acting like a slut. He was not then aware that this individual was his wife’s niece. Mrs. Brouillette took umbrage at the remark, advising her husband that he was speaking about her niece.
When Mr. and Mrs. Brouillette arrived back home in Dartmouth it appears that they engaged in one or two separate verbal altercations arising out of the *584 grievant’s slut remark. The point of disagreement in this proceeding is whether the altercations became physical, and, if so, what occurred.
The grievant and his wife were the only two witnesses to the altercations. We have already noted that they presented a relatively non-incriminating version of the incident at the instant hearing (which will be recounted momentarily). However, on the evening in question, Mrs. Brouillette, if not the grievant himself, presented a more incriminating version of those events.
The two witnesses appeared to agree that before the police got involved, the grievant had left the house, in response to a request or demand from his wife. He also indicated, in his testimony at the instant hearing, that there had been some pushing and shoving (mutual) and that he had decided to leave the house in order to nip any possible escalation of the matter. The grievant went to the nearby home of his wife’s sister. After approximately an hour, during which Mrs. Brouillette had spoken with her sister, the sister suggested to the grievant that he might try to return home. He did so.
When the grievant returned shortly before midnight, the verbal altercation continued. However, there is a conflict into the evidence as to whether the altercation became physical. In any event, the witnesses agreed that Mrs. Brouillette called 911 and reported some type of domestic disturbance, including a claim that her husband had hit her.[fn 1] The grievant then left the house before the police arrived and started to drive away. He indicated at the instant hearing, that he was intending to drive to a hotel.
Dartmouth Police Officer Michael Gill was dispatched to the call at 11:38 p.m. He was advised by the dispatcher that it involved a complaint of domestic violence, in-progress. While he was en route to the Brouillette home he received a further call from the dispatcher, reporting a second call from the alleged victim (Mrs. Brouillette), in which she claimed that after leaving the house, her husband had called her and told her he was coming back to the house, and that he was going to “kill her.”
Gill continued heading to the scene. When he got close to the house, he came upon a vehicle, matching the broadcast description of the grievant’s vehicle, which had been stopped by another Dartmouth Police Officer (White). Gill stopped and determined that it was grievant Brouillette who had been stopped. Gill indicated that he noticed a blood spot on the grievant’s head and asked him about it. The grievant told him that his wife had hit him with a notebook. Gill also indicated that he noticed a hand-set from a cordless telephone on the front seat of the car.
Gill then proceeded to the Brouillette home. He spoke with Mrs. Brouillette. According to Gill’s testimony, as well as his contemporaneous written report, Mrs. Brouillette advised him of the following alleged facts:
the grievant threw a notebook at her which left a mark under her left eye
the grievant punched her in the left breast the grievant took the downstairs cordless phone
she went upstairs to their bedroom to attempt to use the upstairs phone to call the police
the grievant followed her upstairs and
he ripped the telephone out of the wall and
he threw her on the bed and pinched her left breast.
Mrs. Brouillette also advised Gill that after her initial call to the police, the grievant, who had left the house, had called her and told her he was coming back and threatened to kill her.[fn 2]
Gill offered Mrs. Brouillette the opportunity of making an application for a restraining order against her husband. She declined to do so.
Gill, or some other officer, asked Mrs. Brouillette for permission to take photographs of her apparent injuries and/or objects in the house. Photographs were taken of the apparent bruise under her left eye as well as some type of bruise or reddening on the upper portion of her left breast. Photographs were also taken of the upstairs telephone which had been removed from the wall; the wire-bound notebook (which may have been thrown at Mrs. Brouillette and/or Mr. Brouillette); and the cordless hand-set from the downstairs telephone, which was found on the seat of the grievant’s car. (These photographs were presented into evidence at the instant hearing.)
The grievant, who, as noted previously, had been stopped in his car before he was able to return home the second time, was arrested at approximately 12:20 a.m. (on April 7) and booked. The attendant paperwork indicates that he was charged with domestic assault and battery and intimidating a witness. It also indicated that he was suspected of using alcohol (Jt. Ex. 3-31). However, it does not appear that the issue was pursued (whether in the form of a field sobriety test or otherwise; nor was he charged with driving under the influence).
B. The Aftermath of the Incident 1. The Initial Reports
The grievant was arraigned in the- New Bedford District Court on Monday, April 7, 2008. He telephoned his supervisor, Capt. Peter Pascucci, to advise him of the arrest and the charges. The grievant filed a written report of the incident on the following day (April 8). The fairly terse report indicated as follows:
[1] On April 6 2008 while at home my wife and I got into an argument after coming home from a 50th birthday party. [2] Both of us were drinking all night and the argument got to the point where she pushed me and I pushed her back ... [3] I then left the house and was pulled over in front of my house and arrested. [4] I do not remember that much about the night due to having too much to drink. [5] I . . . *585 did call Capt. Pascucci on Monday April 7 2008 around 11:30 a.m. to inform him of the incident. [6] I.. . will report back to court on June 18, 2008. (Jt. Ex. 3-26; bracketed sentence numbers added.)
During the course of the instant hearing, the grievant reaffirmed the accuracy of the various sentences of this report.
DOC referred the matter to its investigative unit. In the interim, no disciplinary or administrative action was taken against the grievant (possibly because the Department was waiting for the results of the criminal proceeding). He was permitted to continue working and he did so (seemingly without any incidents or problems).
2. The Dismissal of the Charges; The Grievant’s Oral Report
When the case proceeded to court on June 18, 2008, Mrs. Brouillette invoked her marital privilege— refusing to testify against her husband. According to Mrs. Brouillette, she told the Assistant DA that she did not want to proceed with the case and she was advised of the privilege. She did not tell the ADA that her prior reports of the incident (to the Dartmouth Police) were inaccurate.
At the instant hearing, as well as in a prior affidavit, Mrs. Brouillette indicated that she did not mention her invocation of the marital privilege to her husband when they were in court. Rather, she told him (incorrectly), that she had told the ADA that her original version of events was not true.
The grievant advised his supervisor, Lt. Pascucci, that the charges had been dismissed. He asked whether he needed to file a written report to that effect. Pascucci advised him (incorrectly), that he did not have to put it in writing. As a result, the grievant did not do so.[fn 3]
3. The Interview of the Grievant
After the dismissal of the criminal charges, DOC continued its investigation of the matter. Sgt. Chad Fióla interviewed the grievant on September 12, 2008 at OCCC. A Union steward was present during the interview.
With respect to the underlying incident itself, the grievant denied that he had hit, pinched or punched his wife, or that he had caused any injuries to the area below her eye or on her upper breast. He acknowledged that he and his wife had an argument and that there had been some shoving (both on her part and his).
With respect to the injury on his own head, he maintained that it occurred when he shaved his bald head in the shower (he indicated at the instant hearing that he had showered when he returned from the party, so that he would be ready for work the next morning — even if, as appeared likely, he did not spend the night at his own home). When Fióla suggested that he had previously told Officer Gill that the cut resulted from a notebook or telephone being thrown at him by his wife, he denied having said that to Gill and he further denied that it occurred.
Fióla also questioned him about his ability to recall the events of the evening in question (in light of sentence [4] of the grievant’s contemporaneous report, which indicated that he didn’t remember that much because he had been drinking). Fióla indicated at the instant hearing that he questioned the credibility of the grievant’s claim that his recollection was diminished due to his allegedly excessive drinking of alcohol; to Fióla, it appeared that the grievant had good recall of those events (without regard to whether the details of his reportage were credible).
Fióla also noted that the grievant was not charged with any alcohol-related offenses and that there was no mention of his possible consumption of alcohol in the police reports, [fn 4]
Fióla also questioned the grievant about the subsequent dismissal of the criminal charges. He told Fióla that his wife told him that she told the ADA that she had fabricated the charges. However, when Fióla listened to the recording of the court session, it indicated that the charges were dismissed due to her invocation of the marital privilege (rather than any alleged fabrication of the original allegations).
Sgt. Fiola’s investigation did not include an interview of Mrs. Brouillette. He indicated that it was not the normal procedure to interview the spouse in a case such as this.
4.The Investigatory Hearing
Sgt. Fióla submitted his report of the investigation on October 7, 2008. The matter was reviewed and it was determined that the grievant’s actions may have been in violation of DOC rules and policies. As a result, the matter was scheduled for an investigatory hearing on January 5, 2009.
In advance of the hearing, by letter dated December 12, 2008, DOC advised the grievant of the charges against him. The letter indicated that the recently-completed investigation revealed, in pertinent part, that on April 6, 2008, he had a physical altercation with his wife and he threatened her; that he did not properly report the dismissal of the criminal charges to the Department; and that he was “less than truthful” when interviewed by Sgt. Fióla, the Departmental Investigator. The letter indicated that he might be subject to discipline up to and including termination.
The hearing was conducted as scheduled by the Commissioner’s designated Labor Relations Advisor (James Morrone). The parties’ counsel in the instant proceeding were in attendance, as was the grievant, a Union steward and Sgt. Fióla. The grievant did not testify.
Mrs. Brouillette did not attend the hearing, but she prepared an affidavit, which was notarized and submitted, [fn 5] The affidavit recanted the incriminating *586 allegations she had made in her 911 call and/or in her statements to Officer Gill on the evening of the incident. She indicated that she fabricated the assault and the threat in order to get back at him. The affidavit included new explanations of some of the seemingly incriminating information previously provided.
With respect to the apparent bruise under her eye, she indicated that she was so mad that she threw the spiral notebook at him. In the process of her “wind-up” or deliveiy, the protruding wire from the spiral accidentally caught the corner of her eye.
With respect to the apparent bruise on her upper left breast, she indicated that it had been inflicted the night before, when, in the process of putting her grand-daughter to bed, the child pinched her (as she was prone to do). She also indicated that she bruised quite easily due to a low iron count in her blood.
She also provided explanations of the two telephones that were previously discussed. She indicated that it was she, rather than her husband, who had severed the upstairs phone from the wall. She indicated that she did so prior to the party, while she was vacuuming the floor in the room. She also indicated that the downstairs cordless phone hand-set was not deliberately removed from the home by the grievant. Rather, it had been inadvertently inter-mingled in a pile of clothes he had brought out to the car when he left the house.
Finally, she indicated that she had lied to her husband on June 18, 2008 as to the circumstances leading to the dismissal of the criminal charges. Although she told him that she told the DA that she had fabricated the whole thing, she acknowledged that she had not done so; rather, as previously noted, she had invoked her marital privilege.
Neither Sgt. Fióla, the Hearing Officer or the Department found Mrs. Brouillette’s recantation affidavit to be credible. In a Decision dated January 7, 2009, the Hearing Officer sustained the charges.
5. The Termination
The matter was referred to the Commissioner, who, as previously indicated, reaffirmed the Hearing Officer’s conclusions as to the grievant’s misconduct. He also determined that termination was the appropriate penalty.
Although the April 25, 2009 termination letter does not reference the point, it appears that this penalty was viewed to be justified, in part by, because there was a prior domestic incident on the grievant’s record — namely a 30-day suspension, imposed on April 25, 2005, based on alleged misconduct which occurred in 2004 (prior to his current marriage to Maria Brouillette).
The grievant suggested during the course of the instant hearing that the underlying incident was fabricated by a disgruntled former girlfriend (not his current wife). However, when the suspension was appealed to the Civil Service Commission, it was upheld (by Decision dated August 18, 2008).
In any event, after the discharge was imposed the matter was duly grieved. In this instance, rather than appealing the matter to the Civil Service Commission, the grievant (and the Union) elected to take the matter to arbitration. The undersigned arbitrator was appointed and the matter has now proceeded to hearing as noted above.
During the course of that hearing, the testimony of the four witnesses (Gill, Fióla, Mrs. Brouillette, Mr. Brouillette) was essentially the same as in their prior statements. Mrs. Brouillette proffered the less incriminating version of events, as previously set forth in her January 2009 affidavit. The grievant reaffirmed, as he had in his September 2008 interview with Sgt. Fióla, that he had not hit his wife or threatened her. Rather, at worst, the two of them had engaged in a shoving match, which did not result in any injuries (the same position taken by Mrs. Brouillette).
POSITIONS OF THE PARTIES
Employer — In the first instance, although it is a relatively minor portion of the current case, the employer submits that the grievant did violate Rule 2(b) when he failed to provide a written report of the dismissal of the criminal charges on June 18, 2008. Although the grievant may have received bad advice on this point from his Captain, ignorance is not a valid excuse for violating tire rule — particularly in view of the fact that the grievant had already been through the court process (and disciplinary process) arising out of a prior domestic violence case.[fn 6]
With respect to the other documentation-related offense [Rule 19(c)], DOC submits that the inaccuracy and incompleteness of the grievant’s reportage is amply established by the evidence of record. Most fundamentally, his April 8, 2008 written statement indicated that nothing more than some pushing back and forth had occurred; whereas the evidence (discussed momentarily) demonstrated that he assaulted his wife and injured her in the area of her eye and breast.
The grievant’s initial statement also claimed that he didn’t remember that much about the evening in question because he had too much to drink. Yet, during his subsequent September 12, 2008 interview with Sgt. Fióla he indicated that he had a pretty good recollection of those events. Moreover, he denied that he had violated any motor vehicle laws and noted that he had not been charged with operating under the influence — which he surely would have been if he had been drinking so much as to forget what occurred that evening.
Some of the grievant’s statements during that September interview were shown to be less than truthful, if not outright false. He told Fióla that he had injured his head while shaving, rather than as a result of having been hit by a notebook (or telephone) thrown by his wife — even though he had previously told Officer *587 Gill that his wife had hit him (with one object or the other). He also claimed, quite incredulously, that the cordless telephone was removed from the house “accidentally,” rather than intentionally. And he misreported the circumstances of the dismissal of the criminal charges — claiming that his wife told the judge that she wanted the charges dropped because she had fabricated them (when, in actuality, she had merely asserted her marital privilege and refused to testify).
The credibility of the grievant and his wife was further undermined when they claimed that they had never discussed the facts of the case prior to her testifying in this proceeding (even though, as Mrs. Brouillette indicated, the grievant had typed the January 2009 affidavit which she presented on his behalf at the investigatory hearing in this matter).
The heart of this case, however, is the underlying incident of domestic abuse. Tbe Employer submits that it has shown, by a preponderance of the evidence, that the grievant assaulted and threatened his wife (notwithstanding her current, but incredible denial of the same).
Mrs. Brouillette’s contemporaneous statements were highly detailed and unlikely to have been concocted simply because she was mad at her husband (notwithstanding her subsequent recantation of those allegations). The version of events initially reported was also corroborated by the photographic and physical evidence. Mrs. Brouillette suffered bruises on her face and breast. The upstairs telephone was yanked out of the wall. The downstairs telephone was taken to the grievant’s car. All of this evidence proves that the grievant assaulted and threatened her.
Mrs. Brouillette’s subsequent January 2009 affidavit and June 2010 testimony at the instant hearing should be seen for just what it was — self-serving statements following reconciliation with her husband, that were put forth in an attempt to protect him. Notwithstanding their testimony to the contrary, it is evident that Mr. and Mrs. Brouillette sat down and went through the allegations and evidence point-by-point in order to figure out a way to refute them.
Given the patent incredibility of this concocted testimony, the only conclusion that may be reached is that the grievant did, in fact, throw a wirebound notebook at his wife, injuring her in the area of her eye; punch her in the breast; intentionally take the cordless phone from the home; tear the second-floor phone out of the wall; call his wife while he was en route back to the house and threaten to kill her; and return to the home to continue to physically abuse her.
These actions are in violation of the above-cited rules and policies of the Department (General Policy; Rule T, Domestic Violence Policy). Those actions are sufficiently horrendous that they would be sufficient to justify termination, even if the grievant had no prior disciplinary history. Here, however, the grievant had prior progressive discipline — a 30-day suspension for a similar offense. If, as the Union has suggested in its disparate discipline argument, COs who commit domestic violence are entitled to a second chance before being fired, the grievant has already had his second chance. Thus, the instant discharge is an appropriate form of progressive discipline, [fn 7]
Union — in the first instance, the Union questions the validity of the Rule 2(b) charge involving the grievant’s failure to provide a written report of the June 18, 2008 dismissal of the criminal charges against him. He provided an oral report to Capt. Pascucci; inquired whether a written report was needed; and was told that it wasn’t.
The Union also questions the related charge that the grievant’s reportage was incomplete or untruthful. Although he did inaccurately report to the Department that the criminal charges were dismissed because his wife told the DA that she made the whole thing up, he only did so because that was what she told him (even though, technically speaking, the dismissal was due to her invocation of the marital privilege). But this does not demonstrate deliberate prevarication on his part.
With respect to the alleged domestic violence, the Union submits that the evidence proved nothing more than a verbal altercation which resulted in some pushing back and forth, without any injuries. The grievant denied that he hit his wife or threatened to kill her. Mrs. Brouillette’s earlier statements to the police were exaggerated because she was mad at her husband and wanted him out of the house. She indicated that those initial reports were not true and that she had scratched her own eye when the protruding spiral binding on the notebook brushed against her face when she attempted to throw it at her husband. She also indicated that the grievant did notrip the upstairs telephone out of the wall; nor did he deliberately remove the downstairs telephone from the house (rather, it was inadvertently taken, along with a pile of clothes).
On the evidence presented, the Union submits that nothing more has been established than an unfortunate argument between a husband and wife. There was no serious injury. There was no restraining order issued as a result. And the criminal charges were ultimately dismissed. Since then, the couple have continued to live together without incident. Since then, the grievant (who might have been suspended), had continued to work without incident for some 13 more months.
In these circumstances, even if the arbitrator were to conclude that some misconduct occurred and that some discipline was appropriate, it should not have been the extreme penally of termination. Even after recognizing that Corrections Officers may be held to higher standards of behavior than civilians, the incident and arrest bore no relationship to the grievant’s employment. The incident was not shown to involve excessive violence that might have called into question the grievant’s ability to handle inmates.
*588 Although the Department has a “zero tolerance” policy with respect to domestic violence, it has acknowledged that the penalty of discharge is not mandated. In the overall circumstances of the current case, as well as those of prior “domestic violence” cases in which discharges were not imposed, [fn 8] the Union submits that the penalty of discharge herein was excessive (disparate discipline) and that it should be reversed. The grievant should be reinstated and made whole for lost pay (including overtime) and benefits.
DISCUSSION and DECISION
I. THE ALLEGED MISCONDUCT
A. No Written Report of Court Appearance
Admittedly, the grievant failed to provide a written report of the June 18, 2008 criminal court session, during which the charges against him were dismissed. However, he did provide an oral report to Capt. Pascucd, who advised him (incorrectly as it turns out), that he was not required to provide a further report in writing.
Even if we were to assume, as the Employer has argued, that this erroneous advice does not constitute a full defense to the charge, in the overall circumstances presented, the lack of a written report cannot be viewed as anything more than a technical violation of Rule 2(b), which would have justified nothing more than an oral warning. In any event, as the Employer has also noted, the offense is so minor in comparison to the other charges that it would not play any role in determining the validity of the instant discharge.
B. The Domestic Violence
The heart of this case is the allegation that the grievant was guilty of two forms of domestic violence on the evening of April 6-7, 2008. Those two offenses, as set forth in 103 DOC 238.03, l.a and b. (p. 3, above), are defined as causing physical harm, or attempting to do so; and placing another in fear of imminent serious physical harm.
If the grievant had been convicted of the parallel criminal charges, DOC could rely on that conviction to establish the misconduct with which he was charged. However, that did not occur herein. Rather, the DA found it necessary to dismiss the charges when the sole complaining witness (Mrs. Brouillette) declined to testify, after invoking her marital privilege.
Unlike the DA, DOC decided to proceed with the case, notwithstanding the apparent recantation of Mrs. Brouillette. I am not unsympathetic to the difficulties which DOC faced in attempting to prove the grievant’s alleged misconduct without the cooperation of the alleged victim. I share DOC’s views as to the likely motivations behind Mrs. Brouillette’s reversal. I share DOC’s views as to her lack of credibility.
As a result, if I had to guess, I would be inclined to believe that Mrs. Brouillette’s initial reports of the incident were accurate; that her subsequent recantation was not truthful; and that the grievant’s denial of the incident was not credible or truthful. Based upon this analysis, one might think that DOC would prevail. If the denials of the grievant and his wife are discredited, that would tend to suggest that the misconduct occurred.
If this case had involved an incident of alleged domestic violence which was witnessed by third parties, the disbelief of the exculpatory version of events presented by the grievant and his wife would mean that the more incriminating version of events provided by the third parties would be credited and therefore, sufficient to establish that the misconduct occurred.
In the present case, however, other than the griev-ant (and his wife), there were no third parties who witnessed the alleged altercation. As a result, there is no first-hand evidence to the more incriminating version of events. If the exculpatory testimony of the grievant and his wife is to be disregarded, we are left with a perplexing question — does the disbelief of that exculpatory testimony constitute affirmative evidence to the contrary? That is, if we disbelieve their denials, is that sufficient to establish that the grievant assaulted and/or threatened his wife?
If I had to guess, my guess would be that the grievant did strike his wife in some manner. He might also have threatened her. However, notwithstanding the possible logic of this guesswork, it is not sufficient in my view, to establish, clearly and convincingly, that the grievant assaulted or threatened his wife (as those offenses are described in 103 DOC 238.03, l.a and b., above). Discharge cases may not stand on suspicions, surmise or guesswork.
Rather, when an employee is terminated, the misconduct must be proven by clear and convincing evidence — a standard which, while falling short of that in criminal proceedings (“beyond a reasonable doubt”), exceeds that which applies in simple civil proceedings (“a mere preponderance of the evidence”).
Thus, even though I might be inclined to guess that the grievant was guilty of the more serious form of misconduct that was charged, I am unable to conclude that his guilt was established clearly and convincingly. Even if the testimony of Mr. and Mrs. Brouillette is found to be lacking in credibility, the disbelief of their testimony does not provide affirmative evidence to the contrary. It simply leaves the evidence in a neutral state (innocence not proved; guilt not proved).
DOC has suggested that the disbelief of the Brouillettes, coupled with the other evidence, was sufficient to satisfy its burden of proof. In my view, however, the available evidence was not sufficient for that purpose. Although the remaining evidence tended to support DOC’s views, it still fell short of establishing the assault or threat.
The Dartmouth Police Department and Officer Gill were told about an alleged assault and an alleged threat. But Officer Gill did not witness the alleged assault or threat. Nor did Sgt. Fióla.
*589 Officer Gill was told about the grievant’s seemingly violent removal of the upstairs telephone from the wall, as well as his removal of the downstairs cordless phone from the house. But he did not witness the alleged removal of the phone from the wall; rather, he only saw the aftermath (which was also portrayed in one of the photographs). Officer Gill did find the downstairs phone in the grievant’s car (and this was also portrayed in one of the photographs). This testimony and evidence was not sufficient to prove that the grievant ripped the phone out of the wall. But it was sufficient to prove that the grievant removed the downstairs telephone from the house. But that single fact does not prove that an assault occurred or that a threat was made.
The photographs of Mrs. Brouillette taken by the police may be consistent with the more incriminating version of events first reported by her. They appear to show bruises or reddening in the area of her left eye and her upper left breast. If there was some other affirmative evidence that such assaults had occurred, this evidence might well be found to corroborate that conclusion. Here however, in the absence of any affirmative evidence of such assaults, those photographs are not sufficient, in and of themselves, to establish that the assault occurred. And they certainly do not speak to the issue of whether the grievant threatened his wife during a telephone call while he was heading back to the house.
In sum, while the overall evidence engenders strong suspicions that the grievant may have engaged in assaultive and threatening behavior which would have constituted domestic violence as defined in the DOC Policy, it fell short of proving, clearly and convincingly, that such misconduct occurred.
The evidence only established that the grievant engaged in a verbal altercation with his wife and that he pushed his wife on the evening in question.
C. The Untruthful or Incomplete Reportage
The grievant was also charged, under Rule 19(c), with failing to provide full and truthful information about the incident when he provided a written statement on April 8, 2008, and when he was subsequently interviewed by Sgt. Fióla on September 12, 2008.
The heart of this allegation effectively incorporates the assault and threat charged considered in the immediately prior sub-section of this Decision. Insofar as we have found that the evidence as to the assault and threat was inconclusive, we must also find the evidence inconclusive in terms of the grievant’s alleged untruthfulness (or omission) of the assault and threat in his written report and statements at the interview.
DOC has also challenged the truthfulness and accuracy of the fourth sentence of the written report, wherein the grievant indicated “I do not remember that much about the night due to having too much to drink.” DOC has questioned the credibüity/veraciiy of this sentence, maintaining that if it were true, it is likely the police would have charged him with OU1, or at least made some reference to his possible inebriation.
While it is true that the grievant was not charged with OUI, we have already noted that DOC was incorrect when it asserted that the police failed to note his possible inebriation. Rather, as previously indicated, the arrest report did indicate that the grievant was suspected of using alcohol. We might also note that his encounter with the police occurred an hour or more after he had returned home from the party. Since there was no indication that he had engaged in any further drinking, the passage of time would have reduced his level of possible inebriation.
Thus, on the evidence presented, I am unable to conclude that the fourth sentence of the grievant’s report, or any of its other sentences, was untruthful, in violation of Rule 19(c).
DOC has also asserted that the grievant’s statements at the September 2008 interview were untruthful. In my view, although it appeared that the grievant had a bloody spot on his head, the evidence was inconclusive as to whether it was incurred while shaving, or due to having been hit by a notebook or telephone thrown by his wife. Thus, I am unable to conclude that the grievant’s statement (attributing it to a shaving mishap) was untruthful.
DOC also questioned the truthfulness of his statement that the cordless telephone was removed from the house accidentally, rather than intentionally, along with a pile of clothes. In this instance, the available evidence does tend to support DOC’s conclusion. Officer Gill indicated that there was no pile of clothes in the car; rather, the telephone was all by itself (as depicted in the photograph).
DOC has also charged the grievant with misreporting the circumstances in which the criminal charges were dismissed. He told Sgt. Fióla that the charges were dismissed because his wife told the DA (or the judge) that she wanted to drop the charges because she had fabricated them (whereas the court records indicate that the charges were dropped when she invoked her marital privilege). This aspect of the grievant’s reportage was erroneous; but it was not his own statement. Rather, he made it clear that he was reiterating something which had been stated to him by his wife. It does appear that this is what Mrs. Brouillette told him (even though it was not true). As a result, I am unable to conclude that the grievant was untruthful when he recounted his wife’s statement to Sgt. Fióla.
II. THE SEVERITY OF THE PENALTY IN VIEW OF THE PROVEN MISCONDUCT
As indicated in the foregoing portions of this opinion, the major charge against the grievant — domestic violence — was not proved. While that form of misconduct, if proved, would have been likely to provide just cause for discharge (particularly in view of the prior offense on the grievant’s record), that severe penalty *590 may not be justified on the basis of the far less serious misconduct which has been proved.
In Section I.A., above, I found that the grievant’s oral report, rather than written report, of the court proceedings, was, at worst, a technical violation of Rule 2(b), which would not justify anything more than an oral warning.
In Section I.B., above, I found that the grievant had a verbal altercation with his wife and pushed her (albeit without proof that he injured her or threatened her, which would have constituted domestic violence).[fn 9]
In Section I.C., above, I found that the grievant’s September 2008 interview statements had been untruthful in one relatively minor way — his explanation of his removal of the cordless telephone from the house.
On an overall basis, the proven misconduct, in view of the grievant’s prior disciplinary record, provided just cause for a disciplinary suspension of no more than three days’ duration. Although the more severe form of domestic disturbance was not proved (domestic violence), it was proved that there was a domestic disturbance with some pushing, and which became a matter of public knowledge when the police were called and arrested him. If this had been his first offense involving a domestic disturbance, one might find that a lesser penalty would be all that could be justified. Here, however, there was a prior domestic disturbance incident on his record, and while the current incident was not proved to be severe, since it was a second incident, it would have justified such a suspension.
CONCLUSION AND REMEDY
For the above-noted reasons, the discharge of the grievant was not for just cause. Based upon the limited misconduct proved, the Department only had just cause to impose a three-day suspension.
The discharge is hereby reversed. The grievant shall be reinstated forthwith, less a three-day suspension, and he shall be made whole for his lost wages and benefits, less interim earnings, if any.
Newton, Mass.
September 28, 2010
LAWRENCE E. KATZ Esq.
Arbitrator

copy of the 27-page Arbitration Decision is attached to this decision.

Specifically, Brouillette was found to have violated 103 DOC 238.03, 103 DOC 238.01, and 103 DOC 238.04(3)(g), which requires employees who are named defendants to provide written notification to “the Superintendent, Division Head, or his/her designee of each and every change in” criminal charge status.

Specifically, Brouillette was found to have violated the following:
Nothing in these rules and regulations shall be construed to relieve an employee . . . from his/her constant obligation to render good judgment, full and prompt obedience of all provisions of law . . . Improper conduct affecting or reflecting upon any correctional institution or the Department of Correction in any way will not be exculpated whether or not it is specifically mentioned and described in these rules and regulations.
General Policy I.
‘You must remember that you are employed in a disciplined service which requires an oath of office. Employees should give dignity to their position . . .” Rule 1.
“Report promptly in writing to your Superintendent, DOC Department Head, or their designee, any change of events regarding ... any involvement with law-enforcement officials pertaining to any investigation, arrest or court appearance.” Rule 2(b)
“Since the sphere of activity within an institution or the Department of Correction may on occasion encompass incidents that require thorough investigation and inquiry, you must respond fully and promptly . . .” Rule 19(c).

Lawrence E. Katz, Esq. has been an inactive lawyer in Massachusetts under Supreme Judicial Court Rule 4:02(4) for the past eleven years, having given notice to the Board of Bar Overseers that he was discontinuing the practice of law in Massachusetts.

The Arbitrator would not allow Officer Gill to testify as to what Mrs. Brouillette said on the 911 tapes notwithstanding the spontaneous or excited utterances exception and Rule 28 of the AAA’s Labor Arbitration Rules.

Officer Gill, however, indicated that there was no pile of clothes in the car and the photograph depicted the same

In July 2004, Brouillette’s then-girlfriend obtained a ch. 209A restraining order against him from the Barnstable District Court. In August 2004, Brouillette called the victim in violation of the restraining order while Sandwich Police Sergeant Christopher McDermott was with her investigating the domestic violence. Brouillette acknowledged that he had called the victim numerous times. Brouillette was arrested and the matter was continued without a finding for six months. The DOC imposed a 30-day suspension on Brouill-ette for violating the DOC’s domestic violence policy. Brouill-ette grieved the 30-day suspension, arguing that his ex-girlfriend lied about the incident and tried to set him up. Brouillette appealed to the Civil Service Commission, which by decision dated August 14, 2008, upheld Brouillette’s 30-day suspension.
The DOC follows a practice of progressive discipline whereby each successive violation of DOC policy results in a greater penalty, see 103 DOC 230.04, although serious disciplinary infractions such as refusal to work or striking a supervisor warrant immediate suspension or discharge without the necessity of prior warnings, see 103 DOC 230.06. ■

The Arbitrator attempts to distinguish between “domestic violence” and “domestic disturbance.” The Court knows of no crime of “domestic disturbance.” Brouillette was charged with domestic assault and battery and intimidating a witness, a felony.

The Arbitrator constantly refers to Mrs. Brouillette’s statement as an affidavit. Clearly, on its face, it is not an affidavit.

To assist in the photographs being taken of her injuries, Mrs. Brouillette had to expose her breast and chest area for the police photographer. For a woman to expose her breast for police photos and then later claim that her husband did not attack her is just not believable under any circumstances by any rational person.

Dartmouth Police Officer Michael Gill, who testified at the instant hearing under subpoena, indicated that he had listened to the tape of the 911 call and had sought to bring it to the hearing; however, the Police Department would not permit him to do so in the absence of a subpoena for the tape. In the absence of the tape, Gill was questioned as to what he had heard when he listened to it. The Union objected and the objection was upheld.
Nevertheless, during the course of her testimony, Mrs. Brouillette indicated that she had told the police dispatcher that her husband had hit her. That same information is also included in the affidavit she submitted in lieu of attending her husband’s January 5, 2009 investigatory hearing.

Although the cordless downstairs phone had been taken from the house and the upstairs phone had been removed from the wall, Mrs. Brouillette indicated that there was one other “land phone” in the house. She also had a cell phone.

There has been no allegation that the grievant’s failure to reiterate the report in writing prevented the information from coming to the attention of DOC management.

As indicated previously (p. 8, above), this portion of Sgt. Fiola’s testimony is incorrect. The arrest record indicated that the grievant was suspected of using alcohol (although he was not charged with any alcohol-related offenses).

Mrs. Brouillette indicated that she was recovering from back surgery she recently had. Although she was purportedly unable to travel to the hearing, she had been driven to a local bank to get the statement notarized.
She indicated that she had hand-written the affidavit in the first instance; and that the grievant then typed it on the computer. Notwithstanding his involvement in that process, she denied that she had discussed the substance of the affidavit with him.

 Even if the grievant is not found to have violated Rule 2(b), the Employer submits that the termination should still stand on the basis of the other violations (discussed momentarily) , which are far more serious and sufficient to justify that penalty on their own.

The Employer notes that all five of the alleged “disparate discipline” cases cited by the Union (p. 19, n. 8, below), involved FIRST offenses. Although the misconduct of one of those individuals (OF) was relatively more serious, and although he was given a 30-day suspension rather than a termination, that is the same penalty which was imposed upon the grievant for his initial offense.
None of the five cited cases involved a second offense, like that of grievant Brouillette. However, there is another case, involving OM, who, after two domestic violence offenses, was terminated. This is consistent with the treatment afforded to the grievant.

Consistent with arrangements made at the hearing, the Union made a post-hearing submission of evidence as to five other COs whose treatment was alleged to be less severe than that afforded the grievant. Rather than utilizing the full names of the COs, I will use their initials.
BB — arrested for domestic A&B (holding his girlfriend against her will). Penalty — one-day suspension.
DF — arrested for domestic assault involving two women; actions included the kicking in of a door, which hit one of the women in the face. Penalty — one-day suspension.
OF — arrested and convicted for domestic assault of wife, who was found with bruised eye, bloody nightgown and broken eyeglasses. Victim indicated her husband punched her, slapped her, broke her glasses and kicked her in the abdomen. Penalty — 30-day suspension.
JP — arrested for alleged domestic assault (punching his wife in the stomach); also accused of improper reporting of the incident to DOC. The criminal charges were dismissed. Penalty — one-day suspension.
RS — arrested and held overnight for violating a restraining order (refused to leave house after being directed by police to do so); Penalty — three-day suspension.

This altercation also led to him being arrested — a situation which is somewhat unbecoming for a Corrections Officer. However, as I understood the Department’s position at the instant hearing, the grievant was not disciplined because he was arrested, but rather because of the alleged misconduct he committed on the evening in question. Thus, the arrest itself may not be viewed as a basis for discipline (particularly where, as here, the charges were ultimately dismissed).